Good morning. Good morning, Your Honors. Josh Wazer on behalf of Stephanie Beverly. The Court is right. Mr. McGoldrick, who represents Ms. Beverly's ex-husband and I, are going to split our time, and we'd each like to reserve 2 1⁄2 minutes in rebuttal. How much time are you going to take? I'll take 7 1⁄2 minutes, 5 minutes right up front, and then 2 1⁄2 in rebuttal. The same for Mr. McGoldrick. The problem I have with the Bankruptcy Appellate Panel's decision is it made itself the trial court. It tried to shoehorn the trial court by saying, look, the trial court felt that it was boxed in by Stern. But that's not the case. The trial court had a trial on the non-dischargeability action and then had the cross motions on the fraudulent transfer action. And the trial court had a significant amount of evidence before it, none of which is the Bankruptcy Appellate Panel. The Bankruptcy Appellate Panel focuses on those letters. The letters are fascinating because you have to think, what is going on in Mr. Beverly's mind? If someone is really trying to commit fraud, are they going to engage in a year-and-a-half letter-writing campaign in which they say, oh, this is what I want to do? The Bankruptcy Court had evidence, both from Mr. Beverly and Mrs. Beverly's divorce lawyer, that she saw this as his attempt to make a number of threats. He said he was going to Mexico. He said he was going to be a priest. He said he was quitting the law. He himself threatened bankruptcy. And Mr. Beverly himself testified, look, this was a horrible divorce, as sometimes they are. They couldn't even talk to each other, Mrs. Beverly's lawyer and Mr. Beverly. So he viewed those letters as a way of going, bam, bam, bam, pay attention, let's get this done. And if it was truly fraudulent, what would have happened? His house would have been sold instantly and we would have had a sham divorce in which the money goes. The problem arises. The problem arose after the divorce. And then the money would have gone right out the door and it would have been an unequal division. And the problem that the Bankruptcy Court panel did not deal with was Mrs. Beverly's critical testimony that she would have done the same deal no matter what because she didn't want to be partners with her ex-spouse who couldn't even talk to her divorce lawyer in an illiquid pension plan. The Bankruptcy Court panel just does not deal with that testimony at all. The Bankruptcy Court had that testimony before. The Bankruptcy Court also had testimony that Mr. Beverly had malpractice insurance. And the largest part of this claim that the creditors have was for malpractice. And, in fact, after the case we went below, the Chapter 7 trustee, and we made a motion before the Bankruptcy Appellate panel to take judicial notice, they denied it, actually sued on the malpractice claim and won, sued the malpractice insurer and got a settlement on the malpractice claim. Who sued on the malpractice? The Chapter 7 trustee. It's at .52.1. Okay. That was subsequent to all this? Yes. Subsequent to all this, they sued Mr. Beverly's malpractice insurer. And the problem that I have with the Bankruptcy Appellate panel's decision is all of these are critical facts. And we all know that a determination of fraudulent attendance, factual in nature in the Bankruptcy Court had all of those facts before on a detailed record. And it looked to all of those facts. It said these are the explanations. Yes, everyone knows Mr. Beverly was raising these issues. But the Bankruptcy Court had an explanation for why he was raising this issue. And the Bankruptcy Court, based on that evidence, didn't find fraud. Bankruptcy Appellate panel just completely ignored all of that evidence. And I'm not sure what they wanted Mrs. Beverly to do. She's getting divorced. She's not worked in 20 years. She's in her early 50s. She has two teenage children. She has no job experience. And all of a sudden, her difficult divorce, nightmare typical West Side divorce. They go to mediation. I mean, there's no question or no one can say this was a sham or a collusive divorce. They go to mediation. And yes, there's a year and a half of these letters. But nothing had ever happened. No judgment had been enacted. She thinks the husband has malpractice insurance. And also, the husband's a lawyer. And there's some question or claim that, oh, this is inappropriate that he took this obligation as part of the divorce. But if you look at Britt, if you look at Roosevelt, if you look at Chanage, all three of those are decisions from this court, two from the Bankruptcy Appellate panel. The professional spouse frequently takes that type of claim. Because the professional spouse has the ability to resolve that on a go-forward basis. Because Mr. Beverly was a lawyer. And he was earning income. Mrs. Beverly hadn't worked in 20 years. So at the end of the day, sitting here today, I don't think that she's here. She wouldn't have done anything different. How could she have? How could she have taken half of an illiquid pension plan with a person her own lawyer couldn't even have a conversation with, let alone agree on something? And ironically enough, the money came in large part from the sale of the house. But they couldn't even agree during the two years and during the time that the Alvin case was pending to sell the house. They had higher sales. But Mr. Beverly and Mrs. Beverly were having such a difficult time that they could not agree. And even after they went to the mediation to resolve this, the divorce lawyer had to threaten the 664.6 motion under California law to enforce the judgment because Mr. Beverly was the son. So when we look at all of this, and again remembering the factual nature of it, it's a non-collusive divorce that happens to have an intersection of litigation coming at the same time. But at least my client thought it was going to either be resolved by her husband on a go-forward basis or by my practice insurance. And I'll preserve my time if no questions. Thank you very much. Good morning. Dennis McGoldrick for Mr. Beverly. This is kind of an interesting case. As a bankruptcy lawyer, you watch these pre-exemption planning cases carefully. So I read Stern. Mr. Beverly read Stern. He gets into a divorce, and he follows Stern. Stern follows 100 years of Ninth Circuit precedent saying, frankly, that you can transfer non-exempt assets to exempt assets before the filing of a case, and it's non-fraudulent per se. With Stern, they were exempt, weren't they? It was part of the logic of Stern. And the BAP points that out. They went from exempt to exempt. I don't think that's quite the case. You know, there's a Dudley case. There's a number of cases in Ninth Circuit where you attack an IRA. An IRA could be attacked if the money wasn't put in based on the tax law. And if you withdraw money from an IRA over time, it can be attacked as just a bank account and not a real IRA that was used for a pension plan. That may be, but the logic of Stern was part of it that these were either partially or fully exempt before they were put into the move from the IRA to the other account. I mean, isn't that right? I understand you were on the panel with Stern. That's also how the BAP distinguished it, too. All right, well, the problem is that all the other cases in Ninth Circuit don't say that. In Werdick, the Werdicks took a loan on their car. That required them to give them their security agreement to a bank or someone else. That's a transfer to a third party. In Crater, which the trustee said is a textbook example of exemption planning, they sold stock to a third party for $40,000. In Wilson, they sold merchandise to a third party and put all the money into an exemption. In Ludwig v. Minich, the debtor cashed in a life insurance policy to an insurance company and put all the money into an exemption. So that might have been part of Stern, but that's not what the 100 years of precedent says. The 100 years of precedent says you can transfer to a third party. It doesn't matter if it's exempt to exempt. You can transfer non-exempt to exempt. Let me tell you what my problem with this case is, and I think counsel hit it right on the head. It's all facts. I'm trying to reconcile with the Mejia case. California and the issue with regard to the Uniform Fraud and Transfer Act is up in the sense that it seems to me when the bankruptcy judge got a hold of this, he focused on that divorce. He really zeroed in on the divorce, and he was looking at the parties. If he hadn't focused on the divorce and stayed there, he could not have got around Mejia. Now, Mejia says that if you can show facts of intent to defraud, delay, etc., that you can defeat the spouse's immunity from the community property debt. Now, it seems to me that when the bankruptcy judge got through, he figured out that the divorce was driving all this, that they had to get the divorce settled. They did it whatever way they had to. And then, as a result of that, he went to what we've winked and blinked and decided, that you can make these settlements. You can make these settlements on these exempt properties, and if you do it right, and as long as there's no intent to defraud, delay, etc., it's okay. Now, it seems to me that's the only way that the bankruptcy court could get there. He focused and said, this is a real knockdown dragout. These parties had no choice. If there was anybody driving it, it was Mr. because he was the one that was making all the proposals. It seemed to me that the wife was the catcher. She was catching all these proposals. So if that's the case, what do we do with the Mejia stuff? I mean, I can't ignore it. But remember that we're here because the outlands brought us here. The outlands, you know, I heard in a couple of cases before you saying that somebody should have just kept going in state court. The outlands should have stayed in state court. They'd have had Mejia in their back pocket the whole time. But the outlands filed an involuntary bankruptcy against them. But the Uniform Fraud and Transfer Act is incorporated in the Bankruptcy Act. But I pointed out in my briefs that the exact same provisions that are in 548 and in 727, that all apply. So we have bankruptcy precedent that says you can make these transfers from non-exempt to exempt. I agree with that. Yes. But what you're telling me, then, is we ignore, then, the fact that the Bankruptcy Act also talks about applicable law, which would include Mejia. We're going to ignore that, and we're going to focus only on the federal aspect of this. Well, I think there's a small issue of preemption. That wasn't argued all the way back in the beginning. We're not in a preemption here, are we? We don't have a preemption argument anywhere. There's not one. No, but this argument wasn't brought up by the BAP or a trial. And I kind of anticipated you might ask it. And I think it's an issue where you could make a preemption claim, because all the code sections are exactly the same. I mean, realize what happened here. The Outlands bring Mr. Beverly into the bankruptcy court where we have all this precedent about the fair transfer from non-exempt to exempt. And then they say, well, gosh, under the Uniform Federal Transfer Act and Mejia v. Reed, you can't do that. Well, had they stayed in state court, they could make that argument. But in bankruptcy court, you can't make that argument, because in bankruptcy court we have 100 years of precedent that says that kind of a transfer is non-fraudulent per se. Both code sections – Wait a minute. Non-fraudulent per se? Per se. Did I misread it? Is that your case? It's not fraudulent per se? We don't have to consider any elements at all. It's just non-fraudulent per se. Your Honor, the Stern case says that if there's – I mean, they point out that if there's completely – if it's a sham transaction, then it's fraudulent. All right? But we don't have a sham transaction here. So pardon me for overstating it a little bit. No, no. I understand that there's an exception. No, no. I just wanted to make – per se, it kind of rings bells. That's all. Mr. Wazier said he wanted – you folks wanted to reserve some time for rebuttal. Thank you. Good morning. Good morning, Your Honor. Sidney Lanier for the appellees, the Chapter 7 trustee and the outland in the 727. Mr. Kapler and I have decided to split our time. I'm taking 10 minutes, and I'm addressing mainly the fraudulent transfer aspect of the case. And Mr. Kapler is addressing the 727 aspect of the case, although they – certainly the facts overlap. You've just heard Mr. Wazier's argument that – which focuses on the intent of Stephanie Beverly in this fraudulent transfer action. She was the catcher. Mr. Beverly was the mover. Well, the law provides, and the briefs have amply illustrated that, that it is the debtor's intent that is the requisite intent here. And what is that intent? It is – the fraudulent intent here is documented chapter and verse in the letters, both – which are set fully out in the BAP's opinion. I understand that, and counsel's argument keeps sticking in my mind, because as I read this, it was obvious that this was – this is not a typical handshake divorce. This was an ugly divorce. It seems as though the lawyer husband was leveraging this thing from day one. And it seems as though the bankruptcy judge focused in on it, that this – that the wife in this – now, I may – maybe if I reread the record and check it, I'll find differently. But all she was doing is catching every proposal he's made, and she was resisting every – for whatever reason. And in the end, they had to take some kind of deal, and they did. They went for mediation or whatever. So if it was the debtor's intent, i.e., Mr. Beverly, are you saying that she was implicit because – Yeah, well, I think I dealt with that in the brief. One thing, at all times, this divorce was a – she was represented by counsel at all times. So it's not Mr. Beverly being the lawyer who's beating his non-lawyer wife up. Mrs. Beverly had protection. Mrs. Beverly also – I mean, most divorces are not pretty, and this one wasn't pretty either. And it's not the trustee's position or the outland's position to state otherwise. However, just because you have a disagreement and bitterness between two people who've been married doesn't mean you don't have the motive to protect your assets against a third – an impending creditor. Now, both of them knew that the outland case was virtually certain to produce a large judgment. And all of this selling of property and, quote, making it disappear, there's actually language like that. Let's take $100,000 now and make it disappear as fast as we can. Now, this was written by Mr. Beverly to Mrs. Beverly and her counsel. This is not an innocent who is not – Mrs. Beverly is not an innocent who doesn't know what's going on. And there are countless letters to Mrs. Beverly, C.C. Mrs. Beverly. She is not at a disadvantage. She gets a million dollars cash, tax – after-tax money, cash. And if she's looking at it as a real good deal to get out of the divorce and she's got to carry, then, the implications of what the husband's trying to do? That's right. And she's not a good-faith taker without notice. She knew exactly what was going on. I mean, it's – I think the Philippe – the Bussarinci case dealt with that, and I think there's a quote in the brief on it that she couldn't take in good faith knowing what she knew. Here she is – I mean, this is a perfect – this deal has a symmetry about it that is designed specifically to defraud the judgment creditors. And they had a particular judgment creditor in mind. Mr. Beverly gets $1.1 million in a pre-tax exempt ERISA account, not executable by any judgment creditor. But he doesn't only get that. He gets all of the debts that could be discharged. So he doesn't – he gets all the – Mrs. Beverly transfers to him all of her community interest in $874,000 worth of debt as well. So here he takes all the debt which could be discharged in bankruptcy. He keeps the $1.1 million in exempt funds. Mrs. Beverly ends up with $1 million in cash, and the creditors are left out in the cold. Did she get any debt? She got a few credit card debts, a nominal debt, basically her personal credit card debts. And Mr. Beverly got a few motorcycles, his hobby. He got those. That was it. This – I think my brief pretty well analyzed exactly the ratio for who got what. And Mr. Beverly, if you take him at his word that his – that he got after – before tax property, you count that with the debt he assumed, and he got a negative $200,000. Well, of course, the law requires us to look at this case from the point of view, this fraudulent transfer case, from the point of view of creditors, not from the point of view of a marriage breakup. The point of view of creditors is the point of view, and that's California law in the Hanson case cited in the brief. It's also California – federal law in the Prishon case. Regarding – I don't know if you want to hear anything on preemption because it's not really an issue because the Bankruptcy Code provides both for applicable state law and a federal system too. So I don't believe that that's really an issue. If you'd like me to address it, I could, but I think that the Bankruptcy Code explicitly does not preempt state law. It incorporates it. Now, the argument that Mr. Wazer makes that poor Mrs. Beverly couldn't have done anything differently, of course she could have. She could have not transferred her half interest in the exempt property to her husband, and she could have kept – they could have divided things equally. But he also made the point it's not unusual for the employee's spouse to keep the retirement plan and the other spouse to get – to basically cash out. That's not an unusual arrangement. Well, it's not – it may not be an unusual arrangement, but when you've got an impending large judgment creditor and you make yourself judgment-proof, if part of your motive is not to divide things up according to skills but to avoid a creditor, that is the big difference in what you say is normal process and what is happening here. And all the levers couldn't be clearer. Why would she want to take – why would she – leaving aside the judgment, why would she want to take a half interest in a retirement plan if she could get all the cash in the house? Well, I'm not saying she got a bad deal. I'm saying that she got a deal that was – that she – Because there are other things she could do, and I don't see any reason why she would want to do that. I wouldn't see any reason why she would want to hold on to half her debts either. But she got rid of all those debts. The Altman litigation was specifically mentioned in the marital settlement agreement. It was – she was to have nothing to do with that. Well, of course, no one wants to have anything to do with a lawsuit or a judgment against one. But they were – but it was community – it was – she was – they were handling community property here. This is a classic case. As the bankruptcy appellate panel saw, you don't get a much more classic case of an intent to hinder or delay creditors in this case. Well, let's stop right there for a minute and clear it up. Did the divorce start before the Altman action? The divorce started about the same time. About the same time. About the same time, several months, I think. Well, it kind of hit a perfect storm because if you take the Altman out of the picture, what they did was perfectly all right. You could have gone a million times and you wouldn't have turned that over. Well, you wouldn't have had the same motive to move in the same ways that they did. Well, of course, but what I'm trying to say is you put a perfect storm divorce with a perfect storm situation with the vision of assets, and we're asked to balance that. And it seemed – I was talking with counsel because I've been trying to sort this out. We have a very experienced bankruptcy judge who listened to this case, and it seemed to me focused on the divorce. He said these people tried to settle the divorce and they were forced into this unfortunate position where they ran into Mejia and the rest of these cases. He couldn't have gone any other way because each of those stands alone. Each of them could be very valid positions, but when you put them together, they explode. So then you pick up the letters back and forth like we've got to avoid the problem that's going to happen with this. And in an ordinary sense, if you weren't in bankruptcy, sure you'd avoid it. You'd do everything you can. Well, I would say one thing. If this was such a contentious divorce, it would have gone to a trial. And it would have been tried in the divorce court, and I don't know that the perfection and the symmetry of the way things were done would have been the same way at all. Let me tell you what the problem is about that position you're taking. We're up here on appeal not to retry this case. You're asking us to retry the case for what if. The bankruptcy judge sat there every day, listened to every one of those facts, and he tried the case. It's not for us to retry the case. Now, the BAP doesn't retry the case either. So when we talk about what if, we have to go back and look at those facts. Well, also, I'd like to make a point about your statement about retrying the case. The fraudulent transfer claims against Mrs. Beverly were not decided in trial. They were decided on motions for summary judgment. So that are the cases of summary judgment sort of cases. Undisputed facts, if they were disputed, it wouldn't have got it. So the bankruptcy judge still viewed the facts and applied the law. But as the bankruptcy appellate panel noted, their review of this part of the case is a de novo review rather than a clear evidence. But the bankruptcy appellate panel found that the evidence was so overwhelming of fraud, and I think that you never get this kind of evidence of fraud in cases. I just want to hear from Mr. Kaplan. Yes, thank you. Thank you very much. Yes. Douglas P. Kaplan of Robinson, Donna, and Wolkowitz, appearing on behalf of Appellee Edward Wolkowitz. The facts of this case take it beyond mere exemption planning and into the realm of dishonest conduct that precludes the debtor from receiving a discharge. In their marriage settlement agreement, the debtor agrees to pay and hold harmless Stephanie Beverly from significant obligations resulting from litigation in the superior court. And it's very significant because these obligations were a community property that they were jointly obligated for. When he assumes them, they become his separate property. So he was, in fact, incurring a new obligation and debt that he didn't intend to pay. And that's the very kind of exception that Stern mentions specifically that would be a fraudulent act as opposed to just normal exemption planning. And by means of the same document in which he assumes this monstrous debt, which is $700,000, $800,000, he gives his wife nearly $1 million in liquid assets and he retains the exempt assets rendering himself judgment-proof for the very debts he is assuming under the same agreement. That just doesn't smell right. It is fraud. The debtor's stated purpose in letter after letter was to prevent the prospective judgment creditors from getting a dime from him or his estranged wife. These facts make the case totally different from In re Stern and related cases that state conversion of non-exempt assets to exempt on the eve of bankruptcy is not fraudulent per se. This takes it out of the per se rule. All the cases that talk about exemption planning talk about per se. This is a very good example of a case that is not subject to the per se rule. The use of the words per se by the courts, including Stern, implies that there are exceptions to the rule, that the exchange of non-exempt assets for exempt may be fraudulent. So I hear you right. I want to make sure I understand you right. If I understand you correctly, you're saying that even if, this is not the precise way to put it, but even if the burden had shifted to you to show that there was something fishy about this settlement, you basically carried your burden of showing this was not an ordinary marital settlement agreement, that this was done with the intention of rendering him judgment proof. Absolutely. Had you not shown that, the bankruptcy court would have been entitled to give it full faith and credit, but you've come forward and essentially rebutted the presumption that this was an arm's length transaction. I think that is the most significant fact about the settlement agreement, is that in the same instrument in which he shoulders the debt, significant debt that turned out to be over $800,000, in the same instrument he renders himself judgment proof. And to me that's something like what they said in Ray Stern. Here's a quote. Our analysis was impliedly infected by the clarification that different conclusions might be reached if on the eve of bankruptcy a debt were created with no intention of repaying the creditor. And that's exactly what happened here. He created a separate property obligation, which was a new debt, a 100% liability for an obligation he only had a 50% obligation to pay previously. So he created a new debt and a new creditor with no intention whatsoever of paying that debt. And that's right. Okay, thank you very much, Mr. Kennedy. Judge Borden, have you hit it on the head? What do you do with Medea? Now there is case law in the preferential transfer argument, case law, that does say really a transfer between divorcing spouses isn't a transfer for preferential and transfer purposes, but I can't fight with the California Supreme Court. But Medea was a case where it simply announced the principle and sent it back to the trial court and said you make your factual findings. That's what our trial court did. Now, first key fact, assets are split 50-50, and that is very important in all the case law. And yes, the debt was not split 50-50, but that made perfect sense. $800,000, that judgment wasn't for $800,000. The judgment was for, I think, $400,000, and it hadn't been entered at the time. Now, they mistake what the divorce agreement is. If you look at the divorce agreement, and it's clear in the fact I actually got it wrong, my client got the sale of the house. They agreed to sell another house in Mexico, split the proceeds. Mr. Beverly got $100,000 in cash from an account. Ms. Beverly got a little more. But this is not the case where it's, oh, you get absolutely nothing. And by the way, you get your law practice and you're making income. My client has no income. So the trial court had all those facts. And then you ask the question, and you could ask the question, okay, Medea says, and the case law says, if it's roughly 50-50, and the Ninth Circuit's clear on this in brick, then you've got to figure out is there anything else there. And we cite a case, it's a bankruptcy case from Florida, the Wysig case. And what that court said, also fraudulent transfer cases, look, exempt planning, that's not fraudulent per se, so what else are we looking at? And what they said was conduct intentionally designed to materially mislead or deceive creditors about the debtor's position, conveyances for less than fair value, or the continued retention and benefit of the asset that you transferred. That's the additional kind of indicia that they're looking at for fraud. And the case law is very clear on this. All of the cases look at that and say 50-50 split, or even not a 50-50 split, we're going to let it be. The Earlwine case from the Fifth Circuit said we're not going to touch that stuff. But then you have to look for the other indicia. And none of those other indicia are here. And then on the last point on Stern, at the time Stern was decided, and I remember it because I had the same issue, I was leading a law firm and I was thinking about putting the money in an IRA, and then at that time it was unclear. The Supreme Court had not yet ruled on how an IRA was going to be treated in bankruptcy and whether it could be broken. And in Stern, lucky Mr. Stern or Dr. Stern, he had $4 million. That's hard to say at the time the case law was. You could challenge it if it wasn't necessary to show that you needed that money for your lifestyle. So anyone who had significant debts didn't want to be in an IRA at that time. They wanted to be in a pension plan. And that's why he transferred the money. That's the only reason why he transferred the money. Nothing further. Thank you. Mr. Goldrick, I think you have about a minute left. Thank you very much. Let me just re-read again one last thing. Mr. Beverly had malpractice insurance. The trustee sued on the bad faith claim and collected on the malpractice insurance. Didn't he think it wasn't going to be covered? No. Mr. Beverly always said it was going to be covered. We scheduled it. We told the trustee about it. Did they deny coverage? Yeah, they denied coverage. But they kind of semi-denied coverage because they paid for counsel for Mr. Beverly in the trial, but they said they were not going to pay for coverage. Did they defend under reservation of rights? I think so, yes. But anyway, the trustee collected it. Okay, so see what happened here? The Outlands put him in a bankruptcy. The trustee settles the malpractice, the bad faith claim against the insurance company, and now the money that should have gone to the Outlands has all gone into the bankruptcy estate to fund all these lawsuits and appeals. It was a bad choice by them. Mr. Beverly should not have to pay twice. He bought his malpractice insurance. He had malpractice insurance. He had the ability to pay had the malpractice insurance been collected. The Outlands chose to bring it here and give all that money to the trustee. Did the bankruptcy court have the malpractice insurance information before it? Yes. Did they pay the entire judgment? No. The trustees sued on a bad faith claim and settled. The trustees settled it and washed it out. It took, I think, like $150,000. Assuming he hadn't gone bankrupt, I assume that Beverly would have sued. That's correct. That's correct. Thank you. Thank you, gentlemen. The case has started. The last two cases on the calendar, Clefty v. Vonage and Bork v. City of Los Angeles, are submitted on the briefs. Thank you. We'll stay in recess. Good morning, everybody.
judges: Brunetti, Silverman, Conlon